730 A.2d 181

Ramone Marcasean **ROBINSON**

v.

**STATE of Maryland.**

**No. 89, Sept. Term, 1997.**

Court of Appeals of Maryland.

May 25, 1999.

288

Daniel H. Weiss, Asst. Public Defender (Stephen E. Harris, Public Defender, and Denise Oakes Shaffer, Asst. Public Defender, on brief), Baltimore, for Petitioner.

Thomas K. Clancy, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., on brief), Baltimore, for respondent.

Argued before BELL, C.J., ELDRIDGE, RODOWSKY, CHASANOW, RAKER, WILNER and MARVIN H. SMITH (Retired, Specially Assigned), JJ.

BELL, Chief Judge.

We granted certiorari in this case to address two issues: whether the trial court's refusal to order disclosure, in connection with the cross examination, of the prior statements, made by two police officers to the Internal Affairs Division (IAD) of the Prince George's County Police Department, was error, in that it violated the right of Ramone Marcasean Robinson, the petitioner, to a fair trial, and whether the trial court properly instructed the jury concerning the IAD investigation. The Court of Special Appeals discerned no error. *See Robinson v. State,* 117 Md.App. 253, 275, 277–78, 699 A.2d 570, 581, 583–84 (1997). Accordingly, that court affirmed the judgment of the Circuit Court for Prince George's County. We shall reverse.

## I.

The petitioner was convicted by a jury of, *inter alia,* assault with the intent to murder, robbery with a dangerous weapon, assault with the intent to rob, conspiracy to commit robbery with a dangerous weapon, three counts of use of a handgun in the commission of a crime of violence, two counts of false imprisonment, and battery,[1] all in relation to the robbery of a

---

1. The trial court struck the jury's guilty verdict on the assault with intent to murder charge, because the jury had failed to enter a guilty

7–11 store in Forestville, Maryland, on January 18, 1996. The petitioner was sentenced to 50 years imprisonment.

The State and the petitioner differed sharply as to the facts of the robbery, as well as on the petitioner's involvement in it. Civilian witnesses, *i.e.*, the victims, established that two men, both masked, were involved in the robbery. One of the men, clad in blue jeans, black sneakers, and a "plaid" shirt,[2] accosted one of the victims while she was emptying trash, put a gun to her head and took money from her purse. The other man forced the other two victims to lie on the floor and demanded the store's money. The testimony was that the store's safe, to which the victims did not have the key, was taken from the store by the robbers.[3] Also presented was testimony concerning the post arrest search of the scene, which resulted in the recovery of the safe and some U.S. currency and coins in wrapping tubes from the parking lot. In addition, the State offered evidence that it recovered $139.00 in coins, which were contained in "the same kind of tube" used by 7–11, and ninety-six Maryland lottery tickets from the front seat of the Nissan Pathfinder the petitioner was driving.

The State also offered, in its case, evidence directly linking the petitioner to the robbery and detailing his participation in the assaults on the two police officers. Officer Smith and Corporal Hooper, who responded to the call that the 7–11 was

---

verdict on the underlying attempted murder count. The court also struck two of the three counts that related to the use of a handgun in the commission of a crime of violence.

2. The petitioner testified that he was wearing, on that night, blue jeans, black boots, and a multi-colored red flannel shirt.

3. Minister Kenneth Harvard testified that, while the robbery was in progress, he pulled up to the 7–11 to use the pay phones located outside at the front of the store. As he went to use the phone, Harvard said, he saw a man wearing "a ski mask," who was also standing near the pay phones. Being nervous, he told the jury, "I kind of acted like I lost my quarter . . . . [and] just slammed the phone down and turned around and started fussing and acted like something was wrong. And I got in my car and I turned the car on and I just pulled off. . . . I went up the street to the Amoco station and asked the lady could I use the phone. I called 911."

being robbed, testified that, upon their arrival, they saw two men in ski masks come out of the store and enter a Nissan Pathfinder. Officer Smith stated that when that vehicle accelerated straight toward him, he fired at it and it skidded to a stop in a snowbank. Corporal Hooper testified that, at that point, prior to slipping on the ice and sliding to the passenger side of the Pathfinder, he yelled at the occupants to place their hands out of the vehicle and that one of the gunmen fired at Officer Smith. Corporal Hooper also testified that after he slipped and fell, shots were fired at him from the passenger side window. Both officers returned the gunfire. According to the officers, Tyrone Glover surrendered without further incident, but the petitioner got out of the vehicle with a gun in his hand. Rather than heed Corporal Hooper's command to drop the gun, they continued, the petitioner pointed it and started to scream and pull the trigger, prompting them to fire at him, striking him four times. The gun the petitioner used was recovered from the scene, having fallen near the petitioner's right hand. The testimony also was that a gun holster was found in the petitioner's pants.

By contrast, the petitioner, the lone defense witness, testified that he played no role in the 7–11 robbery. While he admitted that he was driving the Pathfinder, he said that he was driving Tyrone Glover home and that he stopped at the 7–11 because Glover asked him to stop there. The petitioner claimed to have waited for Glover in the Pathfinder until he received a page and went to use the pay phone. He testified that Glover returned to the vehicle, and fumbled around in it before going back into the store. When Glover returned the second time, the petitioner stated that he was waiting in the Pathfinder, and that when he started to drive out of the parking lot, several shots were fired at his truck from behind a snowbank. One of the shots struck one of the Pathfinder's tires, causing the petitioner to lose control and the Pathfinder to skid into a snowbank. The petitioner maintains that he got out of the Pathfinder with his hands raised, but that he nevertheless was shot several times. He denied being armed or having any knowledge of the gun holster.

At trial, during his counsel's cross-examination of Officer Smith and Corporal Hooper, the petitioner learned that both officers had given statements to the IAD concerning the events surrounding the robbery and the arrest of the petitioner and his alleged co-conspirator, Tyrone Glover. The petitioner did not ask to review Officer Smith's IAD statement at any time during Officer Smith's cross-examination; however, when Corporal Hooper also testified that he had provided a statement to the IAD, the petitioner requested a bench conference, at which he requested both officers' IAD statements, prompting the following exchange:

DEFENSE COUNSEL: "Your Honor, it appears there is no—I'm looking at Rule 4–263, discovery in circuit court. And it talks about disclosure upon request and we made a request in this case. Witnesses, statements of the defendant, statements of codefendants, reports or statements of experts, evidence for use at trial and property of the defendant. But it does not talk about witness' statements. It has been my understanding—had been my understanding, Your Honor, that the witness' statements were discoverable, but they didn't have to hand them over until that witness was on the witness stand or had finished direct examination.

THE COURT: "I think that refers to witness' statements that are statements taken by investigating officers of witnesses, not statements given to Internal Affairs. My question to you is what authority do you have that in the discovery in a criminal case, statements taken under the police officers' Bill of Rights by Internal Affairs are discoverable?

\* \* \* \*

DEFENSE COUNSEL: "These two officers, Officer Smith and Officer Hooper, are obviously the two stars of this particular show so to speak. And they both have made extensive arguments or at least Officer—Corporal Smith has. He gave a 30 page written statement to Internal Affairs. And this other Officer, Officer Hooper, gave a two

page typewritten statement to Internal Affairs. . . . [A]nd I have no way of knowing if there's anything exculpatory."

Although at the conclusion of this colloquy, the prosecutor expressed her belief that the statements were not discoverable and the court noted, "I spent five years in [the State's Attorney's] office and I never saw a statement made to Internal Affairs," the court asked the prosecutor to "inquire of the availability of those statements only to determine whether there is anything exculpatory within them and for no other purpose at this point" and, recessing for the day, told counsel to be in its chambers the next day.

When the petitioner resumed cross examination of Corporal Hooper on the next day, he established that a Fraternal Order of Police attorney had spoken with both officers. His attempt to show that the attorney actually represented Corporal Hooper in the Internal Affairs investigation was met by an objection by the State. At the bench conference convened to consider the objection, the following occurred:

THE COURT: "I'm going to sustain the objection. But more than that, if this area is gone into by further interrogation or in final argument, I intend on my own to instruct this jury that I have viewed the statements, that these police officers were exonerated and that I have found the statement to be totally consistent with their testimony here today.

DEFENSE COUNSEL: "Your Honor, my last question to him was based solely on his answer to my previous question.

THE COURT: "I'm just telling you what I'm going to do.

DEFENSE COUNSEL: "Right."

THE COURT: "You're free to do whatever you would like to do.

DEFENSE COUNSEL: "What I'm saying, Your Honor, is that I asked him if he talked with him. He's the one who brought up talking to the lawyer. I wanted to make sure which lawyer he was talking to and for what purpose. I was not trying to get into the Internal Affairs Investigation, and he was the one that brought that up and not me.

THE COURT: "We're all on the same page. The ball is in your court."

Counsel had appeared in the court's chambers, as instructed, along with an attorney from the County Attorney's office and, as reported by the court,[4] the following occurred:

"Based upon [defense counsel's] request at the close of our trial day yesterday, I requested that counsel appear in chambers at 8:30, and that the statements made by Officer Smith and Hooper to Internal Affairs be available to us at that time. Both counsel and Mr. Aurich from the County Attorney's Office representing the plaintiff and defendant appeared and we informally discussed procedurally how we would proceed. We discussed how we wished to proceed whether totally on the record—I extended that option—or merely having an informal discussion regarding procedure, and then having had that informal discussion, making the record subsequently which we are now doing.

"[Defense counsel's] position was that he was entitled to both the statements of Officer Smith and Officer Hooper to the Internal Affairs department. Mr. Aurich's position on behalf of the Police Department was that these matters were a part of the officers' personnel files and were not subject to production in this matter or any other matter. I made the decision that I would view the documents in camera to determine whether there was any exculpatory information in either of the statements. I have conducted that *in camera* review.

"I have determined that there is no exculpatory information in either of those two statements. I have copies of the statements that are being sealed and marked as Court's Exhibit No. 1 and will be preserved with the evidence that has been admitted in this case thus far for any future court proceedings."

---

4. Defense counsel added that, in order properly and effectively to represent the petitioner, he believed he too should be allowed to review the statements, arguing that an *in camera* review by the court alone was insufficient.

Subsequently, the State called a firearms examiner to testi-fy about the gun recovered from the petitioner and how it differed from those used by the police. On cross examination, the petitioner inquired about, and into, the trajectory analysis done by the witness. This prompted another objection by the State and yet another bench conference to consider it. The State complained that the trajectory analysis "goes specifically to the departmental shooting." Pointing out that objections to inquiring into that area had been sustained previously, the State urged the court to give the instruction on the internal affairs investigation that the court indicated it would give if the petitioner further pursued that line of inquiry. The petitioner disagreed, arguing that cross examination on the trajectory analysis was relevant to more than the internal affairs investigation. He contended that the evidence was in dispute with regard to how wide the Pathfinder's window was open, a photograph showing only about 3 inches, while the officers' testimony indicated that it was open wide enough to accommodate an arm. Thus, the petitioner maintained that the trajectory analysis, demonstrating that all of the bullet holes came from the outside headed inside, was relevant to credibility. The bench conference ended in this exchange:

The Court: "Okay. I'm going to let you go into it and I'm going to instruct on the Internal Affairs investigation so go ahead.

Defense Counsel: "I don't want to interrupt you, but if that's what you think you have to do that's fine. But I think that's important that this gets examined.

The Court: "I agree with you so we'll get it all out."

Thereafter, the petitioner resumed his cross examination of the firearms examiner and, as it had indicated it would, the court gave an "instruction" on the IAD investigation, as follows:

"[L]adies and gentlemen of the jury, it's come out in this case that two matters are going on here. First, there is this case that is for you to consider; and secondly, there's the internal investigation by the police department which takes

place every time a police officer fires his weapon. Just so there's no issue in this case, I have precluded evidence of the Internal Affairs investigation thus far. We're now into it.

"I will tell you the Internal Affairs investigation cleared the two police officers. I will tell you that I have examined the two statements that were made by the two police officers to the Internal Affairs people and have found nothing in there that is exculpatory in this case. And for that reason neither the investigation nor those statements will be coming into this case. But now that the issue has been opened, I want the issue to be fully presented to you."

Still later, after the State had rested and just prior to the petitioner's presenting its case, the jury sent the court a note, requesting it to "[p]lease [d]efine exculpatory." When the court informed the parties that it intended to instruct that "it means free from guilt," the petitioner objected and moved for mistrial:

"Defense Counsel: Your Honor, I was thinking about it over lunchtime. I really think that we need a mistrial in this case. And the reason being that for the State to come in here and try to put in evidence as to what happened in this case and to fragment the evidence into departmental shooting evidence or evidence as to what happened at the time of the shooting, which have to go into in order to defend—.

"The Court: You don't have to go into evidence. And that was the only purpose, that that Internal Affairs Investigation is totally irrelevant to what this jury has to decide. But if you want to put it in, then they have a right to be fully informed of it.

\* \* \*

"Defense Counsel: At this time I will move for a mistrial. I don't think the Court should give the type of instruction as to exculpatory or not. I can't remember the last time I

heard of a police shooting that wasn't found to be a good shooting, at least not in the Washington metro area.

"The Court: Okay. You don't wish to take any position on it?

"Defense Counsel: I think the Court should not answer that question.

"The Court: I'm going to answer it. You don't have any input into my answering it?

"Defense Counsel: No, Your Honor. I think an answer would be another reason for a mistrial.

"The Court: I deny the motion for mistrial."

The Court instructed the jury as it said it would, that exculpatory "mean[s] free from guilt... the opposite of guilty." The jury returned the verdicts as heretofore reported and the petitioner was sentenced.

The petitioner noted an appeal to the Court of Special Appeals. As we have seen that court affirmed, *see Robinson*, 117 Md.App. 253, 699 A.2d 570, and we granted the petitioner's Petition for Certiorari to resolve the important questions presented.

## II.

The intermediate appellate court recognized that "[u]nder the principles adopted by the Court of Appeals in *Carr v. State*, 284 Md. 455, 397 A.2d 606 (1979), as well as *Jencks v. United States*, 353 U.S. 657, 77 S.Ct. 1007, 1 L.Ed.2d 1103 (1957), and the 'Jencks Act,' 18 U.S.C. § 3500 (1994), a defendant is entitled to production of a witness' prior statement if, *inter alia*, the prosecution or the prosecutorial arm of the government is in 'possession' of the statement." *Robinson* at 257, 699 A.2d at 572. It held, however, first, that when a statement is confidential under state law, and developed for non-prosecutorial purposes, and held by a division of a law enforcement agency that is not working in conjunction with the prosecutor, the State does not have access to the statement for the purposes of the *Jencks/Carr* rule, and hence, the defendant is not entitled to production of the statement. *See*

*id.* Second, the court held that any error the trial court may have committed when it "instructed" the jury concerning the IAD investigation, and its outcome, was not preserved in accordance with Maryland Rule 4–325(e),[5] and, in any event, the definition of "exculpatory" provided, being correct, did not constitute "plain error" meriting discretionary review. *See id.* at 277–79, 699 A.2d at 583–84.

(a)

The petitioner argues that it was error for the trial court to refuse to permit him to review, in connection with cross-examination, the statements Officer Smith and Corporal Hooper made to the IAD. Relying on the Jencks Act, the policy underpinnings of which, he says, citing *Bruce v. State,* 318 Md. 706, 724, 569 A.2d 1254, 1263 (1990); *Carr v. State,* 284 Md. 455, 460–61, 397 A.2d 606, 608–09 (1979); *State v. Leonard,* 290 Md. 295, 429 A.2d 538 (1981), affirming, *Leonard v. State,* 46 Md.App. 631, 421 A.2d 85 (1980), applies in Maryland, the petitioner contends that statements in the possession of the IAD of the Prince George's County Police Department are in the possession of the State, because courts have uniformly held that material in the possession of the police is in the possession of the prosecution and must be produced under *Brady v. Maryland,* 373 U.S. 83, 87, 83 S.Ct. 1194, 1196–97, 10 L.Ed.2d 215, 218–19 (1963). For this proposition, he cites *Ortega v. People,* 162 Colo. 358, 426 P.2d 180, 182 (1967), and *State v. Thornburgh,* 220 N.W.2d 579, 586–7 (Iowa 1974); *Commonwealth v. French,* 396 Pa.Super. 436, 578 A.2d 1292 (1990); *U.S. v. Gonzalez* 110 F.3d 936, 943 (2nd Cir.1997).

---

**5.** Maryland Rule 4–325(e) provides:

"(e) Objection. No party may assign as error the giving or the failure to give an instruction unless the party objects on the record promptly after the court instructs the jury, stating distinctly the matter to which the party objects and the grounds of the objection. Upon request of any party, the court shall receive objections out of the hearing of the jury. An appellate court, on its own initiative or on the suggestion of a party, may however take cognizance of any plain error in the instructions, material to the rights of the defendant, despite a failure to object."

Also, he points out that the other Jencks Act requirements are met in this case: "the statements requested were made by witnesses who testified for the prosecution, were requested by the defense, qualify as discoverable Jencks Acts statements, and relate to the subject matter of the witness' testimony." The petitioner further asserts that, although the statements were not in the actual possession of the State when the request was made, the State had access to these statements, proof of which was demonstrated when the State produced them at the trial court's request. Again relying on *Carr,* as well as *Leonard,* the petitioner argues further that the trial court's review of the statements *in camera* was insufficient, because "[a]s the decisions of this Court make clear, the trial court's *in camera* review of the statements did not satisfy the requirements of *Jencks;* defense counsel should have been afforded an opportunity to inspect the statements."

The petitioner's final contention in this Court is that "[t]he trial judge erred in its instructions to the jury concerning the officers' statements during [the] Internal Affairs Division Investigation and the outcome of that investigation." Those instructions, the petitioner asserts, invaded the province of the jury and usurped its role as the determiner of credibility.

(b)

The State avers that the petitioner was not entitled to review the witness' statements because they were not in the possession of the prosecution; "[o]nly statements in the hands of the State are discoverable under *Jencks. Goldsmith v. State,* 337 Md. 112, 126, 651 A.2d 866 (1995); *Bruce v. State,* 318 Md. at 725–26, 569 A.2d 1254." It makes clear that it is not "contend[ing] that the police are not ordinarily an arm of the prosecution, *see e.g., Barbee v. Warden, Maryland Penitentiary,* 331 F.2d 842, 846 (4 th Cir.1964) (the police are a part of the prosecution and disclosure requirement applies to them)," only that statements made to the IAD are rendered confidential by § 728(b) of the Law Enforcement Officers' Bill of Rights ("LEOBR"), Maryland Code (1957, 1992 Repl.Vol., 1995 Cum.Supp.), Article 27, §§ 727 to 734B, *see Mayor and*

*City Council of Baltimore v. Maryland Committee Against the Gun Ban,* 329 Md. 78, 617 A.2d 1040 (1993), so that they are neither in possession of the State nor, for that reason, subject to disclosure. In any event, the State argues that the trial court satisfied *Jencks* by conducting an *in camera* review of the IAD statements.

Finally, the State contends that only one of the petitioner's two jury instruction contentions is preserved for review.[6] It points out that the petitioner's only objection was made to the trial court's instruction on the definition of exculpatory. The State thus urges the Court to hold that because the petitioner did not object to the initial jury instruction, he waived the claim on appeal. It asserts that the definition the trial court gave the jury was correct. In any event, the State maintains, the instructions did not constitute plain error, because "[s]uch errors are only recognized when they deprive the defendant of his right to a fair trial. *See e.g., Bruce v. State,* 328 Md. 594, 611, 616 A.2d 392 (1992), *cert. denied,* 508 U.S. 963, 113 S.Ct. 2936, 124 L.Ed.2d 686 (1993)."

### III.

In *Carr v. State,* the Court of Appeals adopted principles that were earlier enunciated by the Supreme Court in *Jencks v. United States,* 353 U.S. 657, 77 S.Ct. 1007, 1 L.Ed.2d 1103. *See also Jones v. State,* 310 Md. 569, 582–83, 530 A.2d 743 (1987), *vacated,* 486 U.S. 1050, 108 S.Ct. 2815, 100 L.Ed.2d

---

6. The State argues, as the Court of Special Appeals held, *see Robinson v. State,* 117 Md.App. 253, 268, 699 A.2d 570, 578 (1997), that since the petitioner did not request production during Officer Smith's cross examination, he did not timely request review of Officer Smith's IAD statement and, thus, his claim in that regard is not reviewable on appeal. As the petitioner points out, however, notwithstanding that the request was made during the cross examination of Corporal Hooper, it, like the court's ruling, encompassed both statements and, more important, the court treated the request as timely. *See* Maryland Rule 8–131(a), which, as relevant, states, "Ordinarily, the appellate court will not decide any other issue unless it plainly appears by the record to have been raised in or decided by the trial court, but the Court may decide such an issue if necessary or desirable to guide the trial court or to avoid the expense and delay of another appeal."

916, *aff'd in part and vacated on other grounds,* 314 Md. 111, 549 A.2d 17 (1988); *Chief, Montgomery County Dep't of Police v. Jacocks,* 50 Md.App. 132, 139, 436 A.2d 930 (1981) (noting that, by judicial decision, Maryland courts have adopted the underlying principles in *Jencks v. United States* ). Those principles relate to the importance of cross examination and the significance, to an accused, of determining whether a witness' trial testimony is inconsistent with the witness' prior written statement on the subject.

The Supreme Court, in *Jencks,* 353 U.S. at 668, 77 S.Ct. at 1013, 1 L.Ed.2d at 1111, held that, in criminal cases, after a witness has testified on direct examination for the prosecution and upon motion by the defense, the prosecution must produce for inspection all written reports or statements made by the witness concerning the subject matter of the testimony. Rationalizing the holding, the Court stated:

"Every experienced trial judge and trial lawyer knows the value for impeaching purposes of statements of the witness recording the events before time dulls treacherous memory. Flat contradiction between the witness' testimony and the version of the events given in his reports is not the only test of inconsistency. The omission from the reports of facts related at the trial, or a contrast in emphasis upon the same facts, even a different order of treatment, are also relevant to the cross-examining process of testing the credibility of a witness' trial testimony."

353 U.S. at 667, 77 S.Ct. at 1013, 1 L.Ed.2d at 1111.

*Carr* involved a prosecution for assault with intent to murder and related offenses, in which an important prosecution witness testified on matters involving identity in a manner that may have been inconsistent with the prior signed statement the witness gave the police on the morning of the incident. The defendant's request that the statement be produced was denied by the trial court. We opined:

"Every skilled trial advocate knows the crucial importance in such situations of cross-examination. Effective cross-examination here made it necessary that defense counsel be

permitted to directly confront the witness with his inconsistent prior statement. To deny to defense counsel the tool necessary for such adequate cross-examination under these circumstances amounts in our view to a denial to the defendant of due process of law."

284 Md. at 472–73, 397 A.2d at 615. We thus held that, for cross-examination purposes, defense counsel is entitled to inspect prior written statements of crucial State's witnesses who have testified at trial to determine whether those statements are inconsistent with their trial testimony.

This principle was reiterated and explicated in *State v. Leonard*, 290 Md. 295,. 429 A.2d 538 (1981), in which we affirmed *Leonard v. State*, 46 Md.App. 631, 421 A.2d 85 (1980), for the "reasons set forth" in the intermediate appellate court's opinion. Judge Wilner, later the Chief Judge of that court and now a member of this Court, speaking for the Court of Special Appeals, explained:

> "*Carr* makes clear beyond question that a defendant's right, at trial, to inspect the prior statement of a State's witness who has testified is not necessarily limited (1) by the rules pertaining to pretrial discovery, or (2) to statements that are merely exculpatory. When confronted with the actual testimony of a critical witness and the knowledge that the witness has given a prior statement bearing on a material issue in the case, counsel is not engaged in a mere "fishing expedition" in seeking access to the prior statement. At that point, it becomes more than a matter of casting a seine over the State's files to see what turns up, but of directly confronting the witness; and the statement thus assumes a specific importance and relevance beyond its general value for trial preparation. *See Carr*, 284 Md. at 472, 397 A.2d ·606. The· test clearly is whether the statement is, or may be, inconsistent with the witness' trial testimony, and thus usable in cross-examination."

*Leonard*, 46 Md.App. at 637–38, 421 A.2d at 88–89. Also addressed in that· case was the test for determining whether a prior statement is inconsistent with a witness' trial testimony:

"These more subtle aspects of potential inconsistency, intrinsically subjective, have to be viewed from the defendant's perspective, and can be properly weighed only by defense counsel (with the assistance of his client). A screening of the statement by the court cannot suffice as an effective substitute. The court cannot be expected to view in the same context as defense counsel these more latent and subtle gaps or differences; nor should it purport to do so. It is for that reason as well that the court erred. If any weight is to be given to the aforequoted considerations, as we think the Court of Appeals intended, it is incumbent upon the court, under the circumstances evident here, to permit counsel to inspect the statement and determine for himself whether it is or is not usable for cross-examination. The court still retains, of course, the ultimate right to determine whether the statement, or any part of it, is admissible in evidence, either as a document or through questions propounded to the witness. The issue here is not admissibility but inspection for possible use in cross-examination."

*Id.* at 638–39, 421 A.2d at 89.

Subsequent to the decision in *Jencks,* Congress enacted the "Jencks Act," clarifying and limiting the *Jencks* holding. *See Jones,* 310 Md. at 584, 530 A.2d 743; *Jacocks,* 50 Md.App. at 139, 436 A.2d 930. Although the Maryland Legislature has not enacted a counterpart to the "Jencks Act," both the petitioner and the State proceed, as did the Court of Special Appeals, *see* 117 Md.App. at 257, 699 A.2d at 572, from the premise that this case is controlled by the Jencks Act. Neither *Carr* nor subsequent cases has wholly adopted the Jencks Act and its discovery rules. It is fair to say, however, that Maryland courts have looked to the Act, as well as subsequent analysis and interpretation of the statute, for guidance in interpreting the reach and ramifications of the *Carr* decision. *See Jones,* 310 Md. 569, 530 A.2d 743; *Kanaras v. State,* 54 Md.App. 568, 577, 460 A.2d 61 (1983) (Maryland courts have "implicitly accepted the underlying foundations" of the Jencks Act "without adopting wholesale the rules contained therein").

*See also Bruce v. State,* 318 Md. 706, 724–26, 569 A.2d 1254, 1263–64 (1990); *Butler v. State,* 107 Md.App. 345, 357–60, 667 A.2d 999, 1005–06 (1995); *Whitehead v. State,* 54 Md.App. 428, 440–41, 458 A.2d 905, 911 (1983).

The petitioner and the State agree that the only issue to be resolved with respect to the discoverability of the officers' statements to the Internal Affairs Division of the Prince George's County Police Department is whether such statements are in the possession, actual or constructive, of the prosecution. To be sure, as the State concedes, ordinarily the police are an arm of the prosecution, for purposes of the *Jencks/Carr* analysis, and, thus, a disclosure requirement applicable to the prosecution applies to them as well. *See, e.g., Barbee v. Warden, Maryland Penitentiary,* 331 F.2d 842, 846 (4 th Cir.1964) ("[t]he police are also part of the prosecution, and the taint on the trial is no less if they, rather than the State's Attorney, were guilty of the nondisclosure."); *State v. Giles,* 239 Md. 458, 470, 212 A.2d 101, 108 (1965), *rev'd on other grounds,* 386 U.S. 66, 87 S.Ct. 793, 17 L.Ed.2d 737 (1967)("It would not be unreasonable therefore to charge the prosecutor and his agents who have the duty of preparing and presenting the case, with knowledge of all seemingly pertinent facts related to the charge which are known to the police department who represent the local subdivision that has jurisdiction to try the case."). *See also* Maryland Rule 4–263, which, in pertinent part, provides:

> "(g) Obligations of State's Attorney. The obligations of the State's Attorney under this Rule extend to material and information in the possession or control of the State's Attorney and staff members and any others who have participated in the investigation or evaluation of the action and who either regularly report, or with reference to the particular action have reported, to the office of the State's Attorney."

To the same effect are *Ortega v. People,* 162 Colo. 358, 426 P.2d 180, 182 (1967); *State v. Thornburgh,* 220 N.W.2d 579, 586–87 (Iowa 1974).

The authorities are split, however, on the narrower question, whether, for purposes of *Jencks/Carr,* the Internal Affairs Division of a police department is an arm of the prosecution. Under the circumstances presented in *State v. Roy,* 151 Vt. 17, 557 A.2d 884 (1989), the Supreme Court of Vermont said, "no."

In Vermont, misconduct by State Troopers is required, by statute, to be investigated by the Office of Internal Investigation within the Department of Public Safety. Under the statute,[7] records of any such investigation are confidential. Moreover, the statute contains no exceptions for the use of the records in court or for access to them by the prosecution. The defendant sought to obtain the file of the trooper that arrested him for use in the assault case that the trooper had brought against him. The Vermont Supreme Court denied the request, holding that the file was not in the "possession, custody, or control" of the prosecution. *Id.* 557 A.2d at 893–94. Thus, it was not discoverable. The court refused to put the prosecution in "the untenable position of facing an obligation to disclose a file that it did not have and was unable to get," *id.* at 894, noting that the defendant could subpoena the records from the Department of Public Safety, which could then state its position. *Id.* at 895.

A different result was reached in *Commonwealth v. French,* 396 Pa.Super. 436, 578 A.2d 1292 (1990), *aff'd,* 531 Pa. 42, 611 A.2d 175 (1992). In that case, the defendant, who had been charged with, *inter alia,* resisting arrest and assault, sought

---

7. 20 V.S.A. § 1923(d) provides:
 "(d) Records of the office of internal investigation shall be confidential, except:
 "(1) The state police advisory commission shall, at any one time, have full and free access to such records; and
 "(2) The commissioner shall deliver such materials from the records of the office of internal investigation as may be necessary to appropriate prosecutorial authorities having jurisdiction; and
 "(3) The state police advisory commission shall, in its discretion, be entitled to such authorities as it may deem appropriate, or to the public, or to both, to ensure that proper action is taken in each case."

discovery of the IAD file on the investigation of the incident triggering his arrest and the conduct of the officers involved, including the arresting officer. *Id.* 578 A.2d at 1294. The trial court ordered the file produced, reviewed it *in camera,* and reported "that no exculpatory material was contained therein nor were any of the officers' statements inconsistent with the trial testimony thus far elicited." *Id.* at 1299. Affirming the refusal to disclose the entire file, the intermediate appellate court held that the statements the officers made to IAD should have been disclosed. *Id.* at 1301. Similar results were reached in *United States v. Gonzalez,* 110 F.3d 936, 939 (2d Cir.1997) (testimony of police officer at a police hearing to determine whether an off-duty fellow officer was justified in firing weapon.); *United States v. Bruton,* 647 F.2d 818, 827 (8 th Cir.), *cert. denied,* 454 U.S. 868, 102 S.Ct. 333, 70 L.Ed.2d 170 (1981) (F.B.I. agent's shooting report is a statement for purposes of the Jencks Act and should have been produced.)

The difference between the cases is the focus of the court in *Roy* on the confidentiality of the records sought, while in neither of the cases relied upon by the petitioner does confidentiality seem to be an issue. Relying on that distinction and noting the *Roy* court's observation that "in states where decisions have given defendants wide access to law enforcement personnel files in cases involving a claim of self-defense, there is either no specific privilege or confidentiality statute or the statute authorizes the result," the State, joining the Court of Special Appeals, maintains that whether the IAD statements are confidential is material to the issue of whether the prosecution possessed them; it asserts, "it is *because* the records are confidential that the prosecutor was not entitled to them and therefore not in possession of them." [8]

---

8. The State asserts that the petitioner's access to the IAD statements is regulated by the Maryland Public Information Act, Maryland Code (1984, 1995 Repl.Vol., 1997 Supp.), §§ 10–611 to 10–630 of the State Government Article. What we are here concerned with is a trial right, not pre-trial discovery. What the petitioner seeks is effective cross examination of a prosecution witness, hoping to uncover inconsistencies in his trial testimony, and material with which to do so. The trial

Section 728(b)(5)(iii) and (iv) is offered as the authority for the conclusion that IAD records are confidential. It provides:

"(b) Whenever a law enforcement officer is under investigation or subjected to interrogation by a law enforcement agency, for any reason which could lead to disciplinary action, demotion or dismissal, the investigation or interrogation shall be conducted under the following conditions:

\* \* \* \*

"(5) . . .

"(iii) In addition, the law enforcement officer under investigation shall be furnished with a copy of the investigatory file and any exculpatory information, but excluding:

"1. The identity of confidential sources;

"2. Any nonexculpatory information; and

"3. Recommendations as to charges, disposition, or punishment.

"(iv) The law enforcement officer under investigation shall be furnished with a copy of the investigatory file and the exculpatory information described under subparagraph (iii) of this paragraph not less than 10 days before any hearing if the officer and the officer's representative agree:

"1. To execute a confidentiality agreement with the law enforcement agency to not disclose any of the material contained in the record for any purpose other than to defend the officer; and

"2. To pay any reasonable charge for the cost of reproducing the material involved."

Subsection (b)(7)(ii) is also relevant, it makes clear that any statement by the officer "required by the law enforcement agency under this subparagraph [is] not admissible or discov-

---

right arises when the witness testifies. The petitioner simply is not able to utilize, in a timely and meaningful manner, the Public Information Act. Moreover, were that to be the only recourse, it is likely that trials will seriously be impacted.

erable in any criminal proceedings against the law enforcement officer when the law enforcement officer has been ordered to submit thereto."

To be sure, § 728(5)(b)(iii) and (iv) of the Law Enforcement Officers' Bill of Rights limits access to the internal investigation file to the affected officer, and then only to exculpatory information, and does not expressly provide for access by anyone else. It is also true that this section requires execution of a confidentiality agreement, restricting disclosure to purposes of defending the officer, and that § 728(b)(7)(ii) prohibits, under certain circumstances, the use of any statements the officer may have given or the results of any tests he or she may have taken. These provisions deal only with the rights of the officer and serve as a protection for them. They do not address, or even purport to address, the due process concerns that are at the heart of the *Jencks*/*Carr* principle and are critical to the resolution of this case. Indeed, when due process concerns have been involved, the confidentiality of the records have been held to yield to those concerns. *Jacocks, supra,* 50 Md.App. at 144, 436 A.2d at 936–37.

In that case, the issue was "in the context both of statutory construction of LEOBR and the application of *Jencks-Carr* ... whether discovery of the statements in question is mandated as an extension of appellee's right under § 730(d) to cross-examine the witnesses against him, or conversely, whether the internal investigation file is specifically privileged and thus non-disclosable under § 728(b)(12)." *Id.* at 137, 436 A.2d at 933. Recognizing that Maryland has, "[b]y judicial decision, ... adopted the underlying principles set forth in the Jencks Opinion, at least with respect to criminal cases, as a necessary outgrowth of the right of cross-examination," *id.* at 139, 436 A.2d at 934, and noting that "administrative agencies, including LEOBR hearing boards, must observe the basic rules of fairness, and that is what the *Jencks* rule is all about," *id.* at 143, 436 A.2d at 936, the court held that, notwithstanding the restriction on disclosure contained in the act, the officer was entitled to review, and use at his administrative

hearing, the statements given by witnesses during the IAD investigation.

Confidentiality does not ordinarily negate possession, actual or constructive. In other words, that a statement may be confidential goes to its discoverability, rather than to who possesses it. In this State, each major police department has an IAD division. Consequently, because that division is a part of the police, its records are in the possession of the police. And if the police is an arm of the prosecution, it follows that the records are also constructively in the possession of the prosecution; records in the possession of the police are not rendered not in possession simply because they are made confidential and are not, on that account, shared with, or readily available to, the prosecution. As the petitioner points out,

> "Merely because the State is not required to produce confidential information does not automatically mean that it does not possess it. For example, the police officers involved in a[n] undercover investigation involving confidential informants know the identity of those informants. Even if the officers do not communicate that identity to the Assistant State's Attorney assigned to the case, the prosecution still 'possesses' this information and upon a sufficient proffer by the defense, can be required to produce it. If a sufficient proffer is not made, the identity may remain confidential but the prosecution in either scenario has 'possession' of it."

While confidentiality does go to discoverability, it does not guarantee insulation of the confidential matter from disclosure. The confidentiality interest must be balanced, in this context, against the confrontation and due process rights of the defendant. *See Davis v. Alaska,* 415 U.S. 308, 319, 94 S.Ct. 1105, 1112, 39 L.Ed.2d 347, 355 (1974) (weighing a defendant's confrontation right against the State's interest in the confidentiality of juvenile proceedings and striking the balance in favor of confrontation); *Goldsmith v. State,* 337 Md. 112, 129, 651 A.2d 866, 874 (1995)("In holding that a defendant has no right to pre-trial discovery of privileged records held by a third party, we recognize that the defendant's constitu-

tional rights at trial may outweigh the victim's right to assert a privilege."); *Zaal v. State,* 326 Md. 54, 81–87, 602 A.2d 1247, 1260–64 (1992) (requiring the defendant to demonstrate need for pre-trial disclosure, and once established, requiring the trial court to strike a balance between the victim's privacy interest and the defendant's right to a fair trial). *See also Williams v. State,* 342 Md. 724, 739–43, 679 A.2d 1106, 1114–16 (1996); *People v. York,* 29 Ill.App.3d 113, 329 N.E.2d 845, 851 (1975); *Com. v. Two Juveniles,* 397 Mass. 261, 491 N.E.2d 234, 238 (1986) (considering the need for disclosure of communications to sexual assault counselor and noting that "in certain circumstances the absolute privilege ..., must yield at trial to the constitutional right of a criminal defendant to have access to privileged communications"); *State v. Parnes,* 134 N.J.Super. 61, 338 A.2d 223, 224 (1975). In *Martinez v. State,* 309 Md. 124, 140, 522 A.2d 950, 960 (1987) and *Jones v. State,* 297 Md. 7, 14–15, 464 A.2d 977, 982 (1983), we noted that a defendant may not be entitled to pre-trial disclosure of a witness' grand jury testimony, but the defendant may be entitled to the witness' grand jury testimony for cross-examination purposes, after the witness testifies at trial or at a suppression hearing. *See also State v. Watson,* 173 W.Va. 553, 318 S. E.2d 603, 609–10 (1984).

As the petitioner forcefully argues:

"The statements at issue in this case were given by these officers shortly after the incident to other members of the Prince George's County police. The statements concerned the very same matters which the officers testified to at trial. Even if ... the statements are confidential, Petitioner's trial right to cross-examination and confrontation overrides any interest the State or the police have in keeping these records confidential. These are not sensitive statements involving children's educational progress or child abuse. These are statements by the officers explaining to their superiors how in the course of arresting Petitioner for robbery, they discharged forty-six shots, four of which hit Petitioner."

This case is controlled by the *Jencks /Carr /Leonard* line of cases. These cases make clear that it is defense counsel, rather than the trial judge, who should review a witness's prior statement for inconsistency with his or her trial testimony. *Jencks v. United States*, 353 U.S. at 669, 77 S.Ct. at 1014, 1 L.Ed.2d at 1112 (Court specifically disapproved a "practice of producing government documents to the trial judge for his determination of relevancy ... without hearing the accused...."); *Carr*, 284 Md. at 472–73, 397 A.2d at 615; *Leonard*, 46 Md.App. at 631, 421 A.2d at 85. *See also Jones v. State, supra*, 297 Md. at 15, 464 A.2d at 981, in which this Court again emphasized the point:

> "[W]e hold that the procedure suggested by the State, and followed in some jurisdictions, of having the trial judge inspect the grand jury testimony to determine whether inconsistencies exist or whether that testimony would be of use to the defendant, as was done in this case, is improper.

> \* \* \* \*

> "We see no difficulty with the trial judge reviewing the witnesses' grand jury testimony and excising those matters which do not relate to the subject case, but he should not be making decisions as to what is or is not inconsistent or immaterial to the defendant's case."

Indeed, "[t]he State acknowledges that *Jencks* normally contemplates the opportunity of defense counsel to view the prior statement and that it has been deemed important to permit counsel's eye to examine the statement for inconsistencies [and that t]here is generally no requirement for showing a particularized need for the document beyond the desire to test credibility and impeach the witness."

The State nevertheless maintains that *in camera* review was appropriately conducted in this case. It offers in support of that position that *Zaal* recognized a distinction between confidential and other records containing potentially impeaching information and, while discouraging it, recognized *in camera* review as a viable option available to trial courts. More-

over, the State points out that the Jencks Act "contemplates" *in camera* review to resolve claims that the statements sought do not relate to the witness's direct testimony, the rule implementing the Act provides for *in camera* review of statements containing "privileged information or matter that does not relate to the subject matter concerning which the witness has testified," *see* Fed. R.Crim. Pro. 26.2(c), and federal case law states that *in camera* review is the usual procedure in these cases.

We are not persuaded. As indicated, this Court has never expressly adopted the Jencks Act or the rule implementing it. Moreover, as we have seen, our own cases are at odds with the federal cases, more than a few of which admit a tendency to favor *in camera* review of witnesses' statements.

Nor is the State's reliance on *Zaal* persuasive. Although inspection for possible use in cross-examination prompted the subpoena in *Zaal*, and review of the file was a necessary prerequisite for determining its value for that purpose and, in those respects, it is similar to the case *sub judice, Zaal* is otherwise quite different factually from this case. Rather than a written statement in the possession of the prosecutor, made by a witness who has already testified, as here and in *Carr* and *Leonard*, at issue in *Zaal* was an entire file that was required to be kept by a state agency. The purpose of the review of the prior written statement is straight forward, to determine its consistency with the trial testimony. Thus, there was in *Carr* and *Leonard*, and is in this case, a "particularized need" for disclosure of the statement. *See Dennis v. United States*, 384 U.S. 855, 874, 86 S.Ct. 1840, 1851, 16 L.Ed.2d 973, 986 (1966), *quoting Pittsburgh Plate Glass v. U.S.*, 360 U.S. 395, 401, 79 S.Ct. 1237, 1241, 3 L.Ed.2d 1323, 1327 (1959). The purpose of the review of an agency file, on the other hand, is not nearly so straight forward; its focus necessarily is more general, to discover "impeachment" or exculpatory information. In addition, in *Zaal*, the subject of the records, and her parents, had a privacy interest in the records. To the contrary, in this case, the officers' IAD

statements pertain to the very same subject and is about the same incident as the witnesses' trial testimony.

In this case, the defendant has a particularized need for access to the officers' statements, to test the officers' trial testimony. On the other hand, the officers have been exonerated by the IAD investigation; thus, any privacy interest in their statements that may have existed is no longer applicable.

The State contends finally that any error in not ordering disclosure of the prior statements was harmless beyond a reasonable doubt. To be sure, the petitioner was found not guilty of the attempted murder of the police officers and was convicted only of the robbery and related offenses involving the store employees. Therefore, the State assumes the correctness of its assertion that none of the convictions depended on the officers' credibility. That is not correct. The police officer's testimony, at the very least, was pertinent, and important to the identification of the petitioner as one of the robbers; Officer Smith and Corporal Hooper testified to seeing two men leave the 7–11 and enter the Pathfinder. If the jury questioned the officers' credibility, they may have chosen to believe the petitioner's account of events, that he was not involved in the robbery at all, and that the police officers' shots were unprovoked. Having found error in the failure to allow the petitioner, through counsel, to review the prior statements, we can not apply the harmless error rule in this case since it would be as inappropriate for this Court to review the statements for inconsistency as it was for the trial court to have done so. *See Jones*, 297 Md. at 17, 464 A.2d at 982.

## IV.

In a jury trial, judging the credibility of witnesses is entrusted solely to the jury, the trier of fact; only the jury determines whether to believe any witnesses, and which witnesses to believe. *See Bohnert v. State*, 312 Md. 266, 278–79, 539 A.2d 657, 663 (1988); *Gore v. State*, 309 Md. 203, 210, 214, 522 A.2d 1338, 1341, 1343 (1987); *Battle v. State*, 287 Md. 675, 685, 414 A.2d 1266, 1271 (1980); *Wilson v. State*, 261 Md. 551,

566, 276 A.2d 214, 221 (1971); *Jacobs v. State,* 238 Md. 648, 650, 210 A.2d 722, 723–24 (1965). *See also Dykes v. State,* 319 Md. 206, 224, 571 A.2d 1251, 1260 (1990) (requiring the court to "instruct the jury that it is the sole judge of the facts, the weight of the evidence, and the credibility of the witnesses"); Maryland Rule 4–325(d). Thus, "the general rule is that it is error for the court to make remarks in the presence of the jury reflecting upon the credibility of a witness . . . ,[and] [i]t is also error for the court to permit to go to the jury a statement, belief, or opinion of another person to the effect that a witness is telling the truth or lying." *Bohnert supra,* 312 Md. at 277, 539 A.2d at 662 (citing *Elmer v. State,* 239 Md. 1, 10–11, 209 A.2d 776, 781–82 (1965)) and (citing *Thompson v. Phosphate Works,* 178 Md. 305, 317–319, 13 A.2d 328, 334–35 (1940)); *American Stores v. Herman,* 166 Md. 312, 314–315, 171 A. 54, 55–6 (1934). *See United Rys. Co. v. Carneal,* 110 Md. 211, 232–233, 72 A. 771, 775 (1909), in which the Court said:

> "It is undoubtedly true that a trial judge because of his high and authoritative position should be exceedingly careful in any remarks made by him during the progress of a trial either in passing upon evidence or ruling upon prayers, and should carefully refrain, either directly or indirectly, from giving expression to an opinion upon the existence or not of any fact, which should be left to the finding of the jury."

Similar sentiments were expressed in *Jefferson–El v. State,* 330 Md. 99, 106, 622 A.2d 737, 741 (1993) (citations omitted):

> "It is because judges occupy a distinguished and decisive position that they are required to maintain high standards of conduct. . . . Their conduct during a trial has a direct bearing on whether a defendant will receive a fair trial because their opinion or manifestations thereof usually will significantly impact the jury's verdict. In addition, if the defendant has elected to be tried by a jury, it is the province of that jury to decide the guilt or innocence of the defendant."

 In this case, the petitioner's credibility, as contrasted with that of the officers, was extremely important. The petitioner's defense at trial was the exact opposite of the State's case, that he was not involved in the robbery at all and his involvement in the shooting was only as a victim. As we have seen, the petitioner testified that, while he drove Tyrone Glover to the 7–11, he neither played a role in the robbery, nor was aware that one was taking place. According to the petitioner, Glover robbed the store, without his knowledge, as he waited outside and made some phone calls. The petitioner further testified that, as he was leaving the 7–11 parking lot, the officers began firing at his truck. He denied that he or Glover returned the fire. In fact, the petitioner stated that he did not have a gun and that, although he got out of the Pathfinder with his hands in the air, Officer Smith and Corporal Hooper shot him anyway.

During trial, as previously reported, after informing the petitioner that it would do so, the trial court informed the jury about the IAD investigation, stating:

"[L]adies and gentlemen of the jury, it's come out in this case that two matters are going on here. First, there is this case that is for you to consider; and secondly, there's the internal investigation by the police department which takes place every time a police officer fires his weapon. Just so there's no issue in this case, I have precluded evidence of the Internal Affairs investigation thus far. We're now into it.

"I will tell you the Internal Affairs investigation cleared the two police officers. I will tell you that I have examined the two statements that were made by the two police officers to the Internal Affairs people and have found nothing in there that is exculpatory in this case. And for that reason neither the investigation nor those statements will be coming into this case. But now that the issue has been opened, I want the issue to be fully presented to you."

Later, when the jury inquired as to the meaning of "exculpatory," the court informed it that exculpatory is defined as "free

from guilt .... the opposite of guilty." Thus, in addition to informing the jury of the IAD investigation, the trial court advised it that that investigation had "cleared" the police officers, who were important witnesses against the petitioner, that the officers had given statements to the IAD about the incident that was the subject of the trial, and that the court had read the statements and found nothing in them to exculpate the petitioner. This occurred prior to the petitioner testifying. In so doing, and certainly under the circumstances, the court commented on, and, indeed, resolved a credibility issue.

■ The first objection that the petitioner lodged on this point was to the court's answer to the jury's question. Conceding the timeliness of that objection, the State argues that, because the answer to the jury's question was correct, the petitioner's failure to object when the court initially addressed the jury on the subject constituted a waiver of any error that may have been committed at that time. The State also maintains that any error in the court's "instructions" was harmless because the petitioner was not convicted of any crime as to which the police officers' testimony was crucial.

We hold that the petitioner's objection to the court's "instructions" [9] was timely, pursuant to Maryland Rule 4–325(e), which provides:

> "(e) Objection. No party may assign as error the giving or the failure to give an instruction unless the party objects on the record promptly after the court instructs the jury, stating distinctly the matter to which the party objects and the grounds of the objection. Upon request of any party, the court shall receive objections out of the hearing of the

---

9. *It is doubtful that the court's initial comments to the jury concerning the IAD investigation are "instructions" as contemplated by Maryland Rule 4–325(c). That Rule provides: "The court may, and at the request of any party shall, instruct the jury as to the applicable law and the extent to which the instructions are binding...." The court's comments addressed the credibility of the parties; they advised the jury of other proceedings and the result of those proceedings, the latter of which had a direct bearing on the credibility of the witnesses.*

jury. An appellate court, on its own initiative or on the suggestion of a party, may however take cognizance of any plain error in the instructions, material to the rights of the defendant, despite a failure to object."

It is true of course that the petitioner did not object when the court initially told the jury of the IAD investigation and of its conclusion that the police officers were vindicated, and that their statements were consistent with their trial testimony. He did object, however, when the jury sought clarification. This situation is similar to what occurred in *Dawkins v. State,* 313 Md. 638, 641, 547 A.2d 1041, 1042 (1988), where we held an objection to a jury instruction was preserved under the following circumstances:

"Following the evidentiary portion of the trial, the court instructed the jury on the elements of possession under § 287(a) and (d). The instruction omitted any reference to knowledge being an element of the offenses. Before the jury retired to deliberate, defense counsel objected to the instructions on grounds unrelated to the issue before us. After the start of its deliberations, the jury sought reinstruction on the elements of possession. At that time, defense counsel asked the judge to instruct the jury that knowledge is an element of possession. The judge declined, ruling that knowledge is not an element of the possession offenses under § 287. The judge's reinstruction made no reference to knowledge, and it was objected to on this ground."

(Footnote omitted).

We have already held that the error in refusing to allow the petitioner, through counsel, to review the prior statements of the officers was prejudicial. In addition, we conclude that the trial court's error in commenting on the credibility of the witnesses was prejudicial.

*JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED. CASE REMANDED TO THAT COURT WITH INSTRUCTIONS TO REVERSE THE JUDGMENT OF THE CIRCUIT COURT FOR PRINCE GEORGE'S*

*COUNTY AND REMAND TO THAT COURT FOR A NEW TRIAL AS TO ALL COUNTS. COSTS IN THIS COURT AND IN THE COURT OF SPECIAL APPEALS TO BE PAID BY PRINCE GEORGE'S COUNTY.*

Dissenting opinion by, RAKER, J., in which CHASANOW and SMITH, JJ., Join.

RAKER, Judge, dissenting:

I would affirm the judgment of conviction and the judgment of the Court of Special Appeals and would hold that the trial court did not err in refusing to order disclosure of the police officers' statements made in connection with the Police Department Internal Affairs Investigation.[1] Under the circumstances presented in this case, the State was not required under *Jencks-Carr* to produce those statements because they were not in the possession of the State. Accordingly, the trial court, in ordering that the police department produce the statements, properly reviewed the statements *in camera,* and upon concluding that there was nothing inconsistent between the officers' IAD hearing testimony and their in-court testimony, properly refused to order disclosure of the statements. To the extent that the jury instruction issue was preserved for appellate review, the trial court instruction was a proper statement.

I agree with Judge Salmon, writing for the intermediate court, that "when a statement is confidential under State law, developed for a non-prosecutorial purpose, and held by a division of a law enforcement agency that is not working in conjunction with the prosecutor, the State cannot be deemed to have access to, or constructive possession of, the statement [and] [h]ence, a defendant is not entitled to production of such statements under the *Jenckss-Carr* rule." *Robinson v. State,*

---

[1] On the preservation issue, I would hold that the issue as to Officer Smith's statement under *Jencks–Carr* was not preserved for appellate review. Counsel did not request production of the statement following the officer's direct testimony and he obviously had no desire to use the statement for cross-examination purposes of that witness.

117 Md.App. 253, 257, 699 A.2d 570, 572 (1997). Because the prosecution does not have access to these records, the officers' statements were not within the possession of the prosecutor and thus were not subject to discovery by the defendant.

All parties agree that *Brady* is not at issue in this case, and that Petitioner does not contend that the State failed to provide him with exculpatory *Brady* type material. Instead, the dispute as to the statements focuses solely on the issue of whether the trial judge violated the *Jencks-Carr* rule.

The Jencks Act, codified at 18 U.S.C. § 3500 (1994), clarified and limited the Supreme Court's holding in *Jencks v. United States,* 353 U.S. 657, 77 S.Ct. 1007, 1 L.Ed.2d 1103 (1957). Although there is no Maryland counterpart to the Jencks Act, we have consistently looked to the Act, as well as subsequent analysis and interpretation of the Act, for guidance. *See Bruce v. State,* 318 Md. 706, 724–26, 569 A.2d 1254, 1263–64 (1990); *Jones v. State,* 310 Md. 569, 583–86, 530 A.2d 743, 750–51 (1987), *vacated on other grounds,* 486 U.S. 1050, 108 S.Ct. 2815, 100 L.Ed.2d 916 (1988), *on remand,* 314 Md. 111, 549 A.2d 17 (1988); *Butler v. State,* 107 Md.App. 345, 357–60, 667 A.2d 999, 1005–06 (1995); *Kanaras v. State,* 54 Md.App. 568, 575–80, 460 A.2d 61, 66–68 (1983); *Whitehead v. State,* 54 Md.App. 428, 440–41, 458 A.2d 905, 911–12 (1983).

The Jencks Act sets out the requirements for production of a witness's prior statements as follows:

After a witness called by the United States has testified on direct examination, the court shall, on motion of the defendant, order the United States to produce any statement (as hereinafter defined) of the witness in the possession of the United States which relates to the subject matter as to which the witness has testified.

18 U.S.C. § 3500(b). As the Court of Special Appeals pointed out, in order for a defendant to receive a witness's prior statement under the Jencks Act, the defendant must establish the following:

1. the witness must testify on direct examination;
2. defense counsel must request the statement;

3. the statement must qualify as a discoverable statement under the Jencks Act;

4. the statement must relate to the subject matter of the witness's testimony; and

5. the statement must be in the possession of the prosecution.

*Robinson,* 117 Md.App. at 267–68, 699 A.2d at 578. The focus of the parties' argument in this case is the fifth requirement, *i.e.,* whether the statement is in the possession of the prosecution.

The majority holds that the statements in question are in possession of the prosecution. The majority reasons that because the IAD is part of the police, its records are in the possession of the police for the purposes of *Jencks–Carr.* Maj. op. at 308. The majority continues:

> And if the police is an arm of the prosecution, it follows that the records are also constructively in the possession of the prosecution; records in the possession of the police are not rendered not in possession simply because they are made confidential and are not, on that account, shared with, or readily available to, the prosecution.

*Id.* The trial court and the Court of Special Appeals found otherwise. I agree with those courts.

While county police are ordinarily part of the investigatory arm of the State, this is not true as to all divisions of the police department. *Robinson,* 117 Md.App. at 273, 699 A.2d at 581. The Court of Special Appeals noted:

> The Prince George's County Police Department cannot be viewed as a monolith—it has divisions that, at least for some purposes, are separate and distinct. Under such circumstances, the State's Attorney's Office does not constructively possess all statements held by all divisions of the police department. To know if the State constructively possesses a document, it must be determined whether the division of the police department that holds the document is working in concert with the prosecutor. If so, the State can be deemed to have access to, or constructive possession of, the docu-

ment. *Butler v. State,* 107 Md.App. 345, 359–60, 667 A.2d 999 (1995); *see Trevino,* 556 F.2d at 1272; *Dansker,* 537 F.2d at 61 (statements possessed by the F.B.I. are considered to be in the possession of the prosecutorial arm of the federal government). In contrast, if there is no evidence that the two entities are working in tandem, the State cannot be deemed to have constructive possession of any documents in the other entity's control. *See Bruce v. State,* 318 Md. at 726, 569 A.2d 1254; *see also United States v. Moeckly,* 769 F.2d 453, 463 (8ᵗʰ Cir.1985) (Jencks Act does not apply to statements made to state officials when there is "no joint investigation or cooperation with federal authorities"), *cert. denied,* 476 U.S. 1104, 106 S.Ct. 1947, 90 L.Ed.2d 357 (1986).

*Robinson,* 117 Md.App. at 273–74, 699 A.2d at 581. In interpreting whether under *Jencks* a statement is in possession of the government, courts distinguish between the *prosecutorial* arms of the government and other government departments. *See United States v. Trevino,* 556 F.2d 1265, 1271 (5ᵗʰ Cir. 1977) (a statement in possession of the United States means the prosecutorial division of the government); *see also United States v. Zavala,* 839 F.2d 523, 528 (9ᵗʰ Cir.1988); *United States v. Bourne,* 743 F.2d 1026, 1032 (4ᵗʰ Cir.1984); *United States v. Hutcher,* 622 F.2d 1083, 1088 (2d Cir.1980); *United States v. Weidman,* 572 F.2d 1199, 1207 (7ᵗʰ Cir.1978); *United States v. Dansker,* 537 F.2d 40, 61 (3ʳᵈ Cir.1976); *United States v. Canniff,* 521 F.2d 565, 573 (2d Cir.1975).

In this case, the State was not required to produce the statement of the police officer because the statement was not in the possession of the prosecutor's office, nor was the statement one to which the prosecutor had ready access. The statement was confidential under State law; it was prepared for non-prosecutorial purposes by a division of the police department that was not working in conjunction or in tandem with the prosecutor; and most importantly, the statement was not available to the prosecutor. Accordingly, under the *Jencks-Carr* rule, the State's Attorney did not have possession of the document.

In *State v. Roy*, 151 Vt. 17, 557 A.2d 884 (1989), *habeas corpus denied*, 907 F.2d 385 (2d Cir.1990), the Supreme Court of Vermont addressed the issue of whether statements given by police officers in an internal affairs investigation conducted by the Department of Public Safety were considered statements in possession, custody or control of the prosecution. Roy, charged with assaulting the state trooper who arrested him, sought the trooper's personnel file. The file was compiled by the office of internal investigation within the Vermont Department of Public Safety. The Department of Public Safety was created by 20 V.S.A. § 1923(b) "to conduct investigations of allegations of misconduct by members of the Department of Public Safety, including the state police." *Id.* 557 A.2d at 893. Under the statute, the requested records were confidential. *Id.* The Vermont Supreme Court concluded that the intent of the statute was that the covered records not be subject to disclosure except for statutory purposes, leading the court to find that the statute created a form of evidentiary privilege. *Id.* The court held that because of the confidentiality provision of § 1923(b), the requested information was not within the control or possession of the prosecution and thus, was not discoverable. *Id.* at 893–94. The court further rejected the defendant's claim that due process required that he have access to the information. The court reasoned that, under the circumstances of that case, to require the prosecutor to disclose the information would put the prosecution in "the untenable position of facing an obligation to disclose a file that it did not have and was unable to obtain." *Id.* at 894. The court concluded that the proper procedure for the defendant to follow to attempt to obtain the records was to cause a subpoena to be issued to the Department of Public Safety. *Id.* at 895.

I agree with the *Roy* court that a conclusion that records are privileged or confidential does not end the inquiry. Simply because records may be privileged or confidential does not provide an absolute shield from disclosure. Cases may certainly arise where the defendant's due process rights will require access to privileged or confidential information. As in

*Roy,* the proper procedure for the defendant in the instant case would have been to cause a subpoena to issue to the police department to produce the requested record. *See Pennsylvania v. Ritchie,* 480 U.S. 39, 107 S.Ct. 989, 94 L.Ed.2d 40 (1987); *Goldsmith v. State,* 337 Md. 112, 651 A.2d 866 (1995); Md. Rules 4–264—4–266. The police department and the prosecutor do not have the same interests, and by issuing a subpoena to the police department, the department's position may be stated directly. *See Roy,* 557 A.2d at 895.

### In Camera Review

The majority rejects an *in camera* review procedure on the grounds that even though the federal case law states that *in camera* review is the usual procedure in these cases, our own cases are at odds with the federal cases. Maj. op. at 312. As the majority recognizes, Maryland courts have looked to the Jencks Act and the cases interpreting the Act for guidance in interpreting the development of the *Jencks-Carr* rule and its ramifications. The federal cases hold that the proper procedure is usually *in camera* review. *See, e.g., United States v. Boyd,* 53 F.3d 631, 634 (4th Cir.1995); *United States v. Lopez,* 6 F.3d 1281, 1288–89 (7th Cir.1993); *United States v. Marshall,* 985 F.2d 901, 907–08 (7th Cir.1993); *see also* 18 U.S.C. § 3500(c) (contemplating *in camera* review when the government claims that discovery does not relate to the witness's direct testimony). An in-camera review is consistent with the procedure endorsed by this Court in *Zaal v. State,* 326 Md. 54, 87, 602 A.2d 1247, 1263–64 (1992). In *Zaal,* this Court stated:

> In cases in which access to confidential and/or sensitive records is sought by a defendant and which will be resolved based on credibility considerations, because of which, the trial court determines the 'need to inspect' threshold has been crossed, *the court may elect to review the records alone,* to conduct the review in the presence of counsel, or to permit review by counsel alone, as officers of the court, subject to such restrictions as the court requires to protect the records' confidentiality. Which option the court chooses must depend on various factors, including the degree of sensitivity of the material to be inspected; the strength of

the showing of the 'need to inspect'; whether the information sought is readily identifiable; considerations of judicial economy, etc. The greater the 'need to inspect' showing, *i.e.*, as here, where it is self-evident, and the less sensitive the information, for example, the more likely the records will be reviewed jointly by the court and counsel or by counsel as officers of the court.

*Id.*, 602 A.2d at 1263–64 (emphasis added).

In this case, the trial court reviewed the statements *in camera* and determined that there was nothing contradictory in them. The court did not err in conducting the *in camera* review, nor did the court abuse its discretion in refusing to order defense access to the statements.

### *Harmless Error*

Assuming error *arguendo*, the failure to provide Jencks material is subject to a harmless error analysis. *See Goldberg v. United States*, 425 U.S. 94, 117 n. 21, 96 S.Ct. 1338, 1348 n. 21, 47 L.Ed.2d 603 (1976); *United States v. Gonzalez*, 110 F.3d 936, 943 (2d Cir.1997); *Lopez*, 6 F.3d at 1289; *United States v. Susskind*, 4 F.3d 1400, 1406 (6th Cir.1993); *United States v. Brumel–Alvarez*, 991 F.2d 1452, 1457, 1464 (9th Cir.1992); *United States v. Lam Kwong–Wah*, 924 F.2d 298, 310–11 (D.C.Cir.1991); *Moeckly*, 769 F.2d at 463; *United States v. Bruton*, 647 F.2d 818, 827–28 (8th Cir.1981); *United States v. Gaston*, 608 F.2d 607, 611–12 (5th Cir.1979); *see also Kanaras*, 54 Md.App. at 574, 460 A.2d at 65; *see generally* MOORE'S FEDERAL PRACTICE § 626.2.07 (3d ed.1997). Instead of reversing and remanding for a new trial, this Court, finding error, should apply a harmless error analysis.

The majority reverses the judgment of conviction and remands this case for a new trial. Maj. op. at 317. The majority relies on *Commonwealth v. French*, 396 Pa.Super. 436, 578 A.2d 1292 (1990), *order affirmed*, 531 Pa. 42, 611 A.2d 175 (1992), a Pennsylvania intermediate appellate court decision, as support for its decision. Maj. op. at 305–06. The majority stops short in its discussion of the case, simply noting that "the intermediate appellate court held that the state-

ments the officers made to IAD should have been disclosed." *Id.* In *French,* however, the Pennsylvania court did not reverse the conviction and remand for a new trial; instead, the court held that the error in the case is properly subject to a harmlessness analysis. *French,* 578 A.2d at 1301. The court concluded that the interests of justice and relevant Pennsylvania case law required the court to allow defense counsel an opportunity to argue the merits of the issue to the trial judge who presided over the case; the trial judge then could determine the value of the prior statements to the defense after the benefit of hearing defense argument after inspection of the statements. *Id.* 578 A.2d at 1301–02. Accordingly, the court remanded the case "to the trial court for an evidentiary hearing on whether the court's failure to allow defense access to the Commonwealth witnesses' statements constituted harmless error." *Id.* at 1302. Given the majority's determination of error in the instant case, this Court should do no less. Assuming error, if this Court declines to review the statement for harmless error, the Court should at least remand this case to the trial court for a harmlessness analysis.

Judge CHASANOW and Judge SMITH have authorized me to state that they join in the views expressed herein.